UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――

OSWIN A. CARTER,
                              Plaintiff,

                -v-                                          19-CV-8007 (JPO)

COMMISSIONER OF SOCIAL                                       OPINION AND ORDER
SECURITY,
                              Defendant.

―――――――――――――――――――――――――――――――

J. PAUL OETKEN, District Judge:

Pursuant to 42 U.S.C. § 405(g), Oswin Anthony Carter has challenged the final decision of the Commissioner of Social Security partially denying his application for disability benefits, arguing that it was not supported by substantial evidence and contained legal error. Both Carter and the Commissioner have filed cross-motions for judgment on the pleadings. For the reasons that follow, Carter's motion is granted.

**I.     Background**

Plaintiff Oswin Carter is 58 years old. (Admin. Transcript "Tr." at 160.) He graduated from college in 1993 and began working as a stock trader in 1996. (Tr. at 166-67.) He held that job until 2001, when he was "laid off due to [his] health." (Tr. at 573.) Around that time, he was diagnosed with ulcerative colitis, a chronic bowel disease that causes inflammation in the rectum and large intestine. (*See* Tr. at 1616.)

Carter filed an application for Supplemental Security Income on January 18, 2013, alleging that he became disabled on February 1, 2003. (Tr. at 533.) In his application, he listed a number of conditions that were limiting his ability to work, including ulcerative colitis, proctitis, a heart murmur, failing vision, and earaches. (Tr. at 165.) The claim was denied on March 20, 2013, after which Carter filed a written request for a hearing. (Tr. at 30.) After a hearing in New

1

York on October 16, 2014, Administrative Law Judge ("ALJ") Michael Friedman found that Carter was not disabled.  (*See* Tr. at 30-38.)  In light of his ulcerative colitis, the ALJ found that Carter was "limited to work that involves no more than simple, repetitive, routine tasks requiring only occasional contact with supervisors, coworkers, and the public."  (Tr. at 34.)  Even so, the ALJ concluded that Carter was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (Tr. at 38.)

After the Appeals Council affirmed the ALJ's decision, Carter filed an appeal in the Southern District of New York.  (Tr. at 533.)  In 2017, the district court remanded the case to the Commissioner on the grounds that the ALJ had improperly discounted the view of a treating physician and failed to consider the combined effect of Carter's mental and physical impairments.  (*Id.*)  On remand, ALJ Friedman found that Carter was entitled to disability benefits, but only after November 22, 2017, when he turned fifty-five and his age category changed under Social Security regulations.  (*See* Tr. at 554.)  After that date, according to the ALJ, his "advanced age" and diminished functional capacity meant that he was no longer able to transfer his job skills to other occupations, qualifying him as disabled.  (Tr. at 552, 554.)  Before that date, however, the ALJ found that there were still a number of unskilled jobs that Carter could have performed  (Tr. at 552.)  Carter now appeals this part of the decision, alleging that it is "not supported by substantial evidence" and "contrary to the law."  (*See* Dkt. No. 1 at 3-4.)

**II.     Legal Standard**

Under the Social Security Act, and as relevant here, a disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To establish a disability under the Act, a claimant must demonstrate an impairment "of such severity that he

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In evaluating disability claims, the Commissioner considers (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a "severe impairment" limiting his ability to work; (3) whether the claimant's impairment is listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his past work; and (5) if the claimant does not have that capacity, whether there is other work he could perform. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). At the first four steps, the claimant bears the burden of proof; at the final step, the burden belongs to the Commissioner. *Id.*

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). A court must accept an ALJ's findings of fact unless "a reasonable factfinder would have to conclude otherwise." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis, internal quotation marks, and citation omitted). Legal decisions, on the other hand, "are reviewed *de novo*." *Wood v. Colvin*, 987 F. Supp 2d 180, 188 (N.D.N.Y. 2013). A court "may not affirm a denial of benefits where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguably supported by substantial evidence." *Id.* (internal quotation marks and citation omitted).

**III.   Discussion**

In evaluating Carter's claim, the ALJ undertook the required five-part analysis, finding that Carter had not engaged in substantial gainful activity since January 18, 2013; that Carter suffered from "ulcerative colitis, diabetes, small fiber neuropathy, plantar fasciitis, osteoarthritis of the bilateral knees, obesity, a left heel spur, major depressive disorder, and mild neurocognitive disorder"; that none of his impairments were listed in the regulations; that he retained the residual functional capacity to perform "light work … involving simple, routine, repetitive type tasks" and "only occasional contact with supervisors, coworkers, and the public"; and that he did not have any past relevant work.  (Tr. at 536-552.)  At step five, the ALJ undertook two separate analyses.  Before November 22, 2017, when Carter turned fifty-five, the ALJ concluded that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed," including cleaner, photocopying machine operator, and advertising material distributor.  (Tr. at 552-53.)  After that date, pursuant to Social Security regulations recognizing that it is harder for older individuals to adapt to new work, the ALJ found that there were no jobs Carter could perform.  (Tr. at 554.)  Thus, the ALJ concluded that the claimant was disabled after November 22, 2017, but not before  (*Id.*)

Carter challenges the ALJ's decision on two grounds: first, that the ALJ "failed to properly weigh the medical opinion evidence," and second, that the ALJ "failed to properly evaluate [Carter's] subjective allegations."  (*See* Dkt. No. 14 at 22-35.)  Because the Court concludes that the ALJ improperly weighed the medical evidence in the record, it does not reach Carter's second argument.

The Court begins and ends with the ALJ's decision to discount the opinions of Dr. Elizabeth Fitelson, one of Carter's treating psychiatrists.  Under the treating physician rule, "a treating physician's opinion is entitled to 'controlling weight' when it is 'well-supported by

4

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record,'" *Gualano v. Comm'r of Soc. Sec.*, 415 F. Supp. 3d 353, 358 (W.D.N.Y. 2019) (citing 20 C.F.R. § 404.1527(c)(2)).  The rule "is particularly important in the mental-health context."  *Rodriguez v. Astrue*, No. 07-CV-534, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009).  This is because mental health patients "may respond to different stressors that are not always active," making the "longitudinal relationship between a mental health patient and her treating physician" especially illuminating.  *Bodden v. Colvin*, No. 14-CV-8731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015).

An ALJ who does not give a treating physician's opinion controlling weight must give "good reasons" for discounting it.  *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 3d 496, 508 (S.D.N.Y. 2014).  In addition, the ALJ must explicitly "consider various factors to determine how much weight to give to the opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks omitted).  These factors, known as the *Burgess* factors, are "(1) the frequency of examination and length, nature, and extent of the treatment relationship, (2) the evidence in support of the physician's opinion, (3) the consistency of the opinion with the record as a whole, (4) whether the opinion is from a specialist, and (5) whatever other factors tend to support or contradict the opinion."  *Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010).  Usually, a failure to explicitly consider the *Burgess* factors is "a procedural error warranting remand."  *Guerra v. Saul*, 778 F. App'x 75, 77 (2d Cir. 2019).  But remand is not necessary if a "searching review of the record shows that the ALJ has provided good reasons for its weight assessment."  *Id.* (internal quotation marks omitted).

Carter argues that the ALJ violated the treating physician rule by affording only "limited weight" to a medical questionnaire that Dr. Fitelson filled out in October 2014.  (*See* Dkt. No. 14

at 23.) In that questionnaire, Dr. Fitelson noted that Carter was suffering from "persistent low mood, anhedonia, very poor concentration, low energy/motivation, anxiety, hopelessness, and suicidal ideation." (Tr. at 499.) She also identified a number of additional symptoms, including "appetite disturbance with weight change," "thoughts of suicide," "persistent disturbances of mood or affect," "paranoid thinking or inappropriate suspiciousness," "hallucinations or delusions," and "sleep disturbance." (Tr. at 501.) Given the "length of time and severity of his symptoms," Dr. Fitelson opined that he would be unlikely to function in a work setting for many months, if not more than a year. (Tr. at 500.) She also opined that Carter's mental impairments would cause him to miss more than four days of work per month — an opinion that, if credited, would have meant that Carter could not work as a cleaner, photocopying machine operator, or advertising material distributor. (Tr. at 503, 607.)

As an initial matter, the ALJ did not explicitly consider the *Burgess* factors in determining "how much weight to give to" Dr. Fitelson's opinions. *Halloran*, 362 F.3d at 32 (internal quotation marks omitted). In particular, he did not discuss the nature of the treatment relationship, the evidence in support of Dr. Fitelson's opinion, or whether the opinion was from a specialist — factors that would have weighed in favor of deference.[1] *See Gunter*, 361 F. App'x at 199. Although failing to explicitly apply the *Burgess* factors "is a procedural error," the Court will not remand if "a searching view of the record assures [it] that the substance of the treating physician rule was not traversed." *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (internal

---

[1] The ALJ did mention that Dr. Fitelson "had just begun treating the claimant" in September 2014. (Tr. at 547.) But he did not offer any additional details about the treatment relationship, nor did he explain whether or how the length of the relationship factored into the weight he afforded the doctor's opinion.

6

quotation marks and citation omitted).  This requires evaluating whether the ALJ has provided "good reasons" for its weight assignment.  *Id.* (internal citation omitted).

Here, the ALJ offered two reasons for discounting Dr. Fitelson's October 2014 report.  First, he claimed that the opinions in the questionnaire conflicted with contemporaneous treatment notes from September 2014.  (*See* Tr. at 547-48.)  In those notes, Dr. Fitelson had reported that Carter "engaged in fantasies of retribution when he was angry or agitated but had no intent to act on them"; that he "felt sad and hopeless but had no intent to act on suicidal ideation"; that "[h]is paranoia was simply a belief that most people were bad and wished to harm him"; that he "did not clearly have hallucinations"; and that "she did not think he was [at] risk of harming himself or others." (*Id.*)  But it is not clear how, if at all, these statements contradict the opinions Dr. Fitelson expressed in the October 2014 questionnaire.  To the contrary, the fact that Carter had "fantasies of retribution," even if he did not intend to act on them, suggests that he did, in fact, suffer from "persistent disturbances of mood or affect." (*See* Tr. at 501.)  Likewise, a patient can suffer from suicidal ideation — as Dr. Fitelson said Carter did (*see* Tr. at 499) — even if he does not intend to act on those thoughts.  Carter's belief that most people wish him harm, meanwhile, certainly sounds like the "paranoid thinking or inappropriate suspiciousness" that Dr. Fitelson identified in her questionnaire.  (*See* Tr. at 501.)  And although Dr. Fitelson did report that Carter did not have full-on hallucinations, she noted that he saw "shadows" and "vague shapes" out of the corner of his eyes and "ha[d] seen a person in the room … [when] no one else ha[d] seen them." (*See* Tr. at 1623.)  Thus, the supposed inconsistency between Dr. Fitelson's treatment notes and the questionnaire does not hold up to scrutiny.

The ALJ's second reason — that Dr. Fitelson overstated Carter's limitations in light of contemporaneous improvements in his mental health — is similarly unavailing.  (*See* Tr. at 548.)

7

"By early October 2014," the ALJ wrote, "the claimant reported that his depressive and anxiety symptoms had improved with medication, and he had stable mood, improved energy, no sleep or appetite issues, fewer negative thoughts, and less hopelessness." (*Id.*)  According to the ALJ, the trend continued into 2015.  (*Id.*)  But this is an incomplete and misleading view of the record. Although Carter's symptoms did improve with medication and counseling, his progress was not linear.  On November 6, 2014, for example, Carter reported that he was "feeling better" and having fewer suicidal thoughts.  (Tr. at 1660.)  But on November 10, he told Dr. Fitelson that his appetite was "low," his "motivation to get out [was] low," and he was still having "dark thoughts."  (Tr. at 1665.)  By November 24, his mood was "lighter," he was sleeping better, and it had been a week since he had had any "dark thoughts."  (Tr. at 1681.)  But on December 1, he reported experiencing "passive homicidal ideation" and "a sense of desperation and urgency," and in early January, he said that despite finding his medication "helpful," he had been feeling "more negative again" and was once more having "dark thoughts."  (Tr. at 1686, 1726.)  In March 2015, Carter "denied suicidal ideation and homicidal ideation, and reported that his mood [was] stable."  (Tr. at 1771.)  Also in March, however, his ulcerative colitis began "acting up," exacerbating his anxiety and leading to "an increase in hopeless thoughts."  (Tr. at 1791.)  And in April, Carter told Dr. Fitelson that he frequently fantasized about "'transitioning' to a spiritual realm where he [could] … leave his physical body behind."  (Tr. at 1811.)

Rather than being a reason to discount Dr. Fitelson's opinion, the 2014 and 2015 treatment notes ought to have been a reason for deference.  Indeed, Carter's uneven progress underscores the importance of the treating physician rule in the context of mental health. Because a "mental health patient may have good days and bad days," the "longitudinal relationship between a mental health patient and her treating physician provides the physician

8

with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination." *Bodden*, 2015 WL 8757129, at *9. In addition, the fact that Carter improved with treatment was not, on its own, a "good reason[]" to discount Dr. Fitelson's opinion. *Maskell v. Berryhill*, No. 5:16-CV-60, 2017 WL 2779638, at *8 (D. Vt. June 27, 2017). After all, as Carter's case makes clear, there can be "a great distance between a patient who responds to treatment and one who is able to enter the workforce." *Id.* (quoting *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011)).

Ultimately, the ALJ failed to offer "good reasons" for discounting Dr. Fitelson's opinion.[2] Accordingly, remand is proper.[3] *See Gunter*, 361 F. App'x at 199 (noting that courts will "not hesitate to remand when the Commissioner has not given good reasons for the weight given to a treating physician's opinion").

## IV. Conclusion

For the foregoing reasons, Plaintiff's cross-motion for judgment on the pleadings is GRANTED and the Commissioner's motion for judgment on the pleadings is DENIED. The case is remanded to the Commissioner. The Clerk of Court is directed to close the motions at Docket Numbers 13 and 18, and to close this case.

SO ORDERED.

Dated: March 31, 2021
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[2] Because finding that the Commissioner violated the treating physician rule with respect to Dr. Fitelson is enough to warrant a remand, the Court does not consider whether the ALJ afforded the proper weight to the other medical opinion evidence in the record.

[3] Carter requests that the Court reverse the decision of the Commissioner (*see* Dkt. No.14 at 35), but because the Court reaches no conclusion as to whether Carter was disabled during the relevant period, it declines to do so. The Court likewise declines to order an expedited hearing and decision in this case.

9